UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONNY STEWARD,<br><br>　　　　　　　Plaintiff,<br><br>　v.<br><br>CHRISTIAN PFEIFFER, et al.,<br><br>　　　　　　　Defendants. | Case No. 1:19-cv-01022-DAD-EPG (PC)<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING THAT ALL CLAIMS AND ALL DEFENDANTS BE DISMISSED WITH PREJUDICE AND WITHOUT LEAVE TO AMEND<br><br>(ECF No. 21)<br><br>THIRTY DAY DEADLINE |

Plaintiff, Donny Steward, is proceeding *pro se* and *in forma pauperis* in this civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff filed the Complaint commencing this action on July 26, 2019. (ECF No. 1.) The Complaint brought claims against various defendants alleging that they violated Plaintiff's rights under the Fourth, Fifth, Sixth, Seventh, Eighth, and Fourteenth Amendments by using excessive force against him on May 16, 2019; depriving him of adequate medical treatment for injuries suffered during the May 16, 2019, incident; retaliating against him by filing false disciplinary reports in relation to the May 16, 2019, incident; and denying him adequate process in his disciplinary hearings. The Court screened Plaintiff's Complaint and found that the Complaint failed to state any cognizable claim. (ECF No. 18.) The Court granted Plaintiff leave to file an amended complaint. (*Id.*)

On December 20, 2019, Plaintiff filed a First Amended Complaint ("FAC"). The FAC brings the federal claims of excessive force and inadequate medical care related to the May 16,

2019, incident that Plaintiff included in the original Complaint. The FAC also includes claims that were not included in the original Complaint, including federal claims related to incidents alleged to have occurred in August and October 2019, and various state law claims.

The Court has screened the FAC. For the reasons discussed below, the Court recommends that Plaintiff's federal claims related to the May 16, 2019, incident be dismissed with prejudice; that Plaintiff's new federal claims related to the alleged August and October 2019 incidents and his state law claims be dismissed without prejudice; and that this case be dismissed, and the case be closed.

## I. SCREENING REQUIREMENT

The Court is required to screen complaints brought by inmates seeking relief against a governmental entity or officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). The Court must dismiss a complaint or portion thereof if the inmate has raised claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b)(1), (2). As Plaintiff is proceeding *in forma pauperis*, the Court may also screen the complaint under 28 U.S.C. § 1915. "Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that the action or appeal fails to state a claim upon which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii).

A complaint is required to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Plaintiff must set forth "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). The mere possibility of misconduct falls short of meeting this plausibility standard. *Id.* at 679. While a plaintiff's allegations are taken as true, courts "are not required to indulge unwarranted inferences." *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677,

681 (9th Cir. 2009) (citation and quotation marks omitted). Additionally, a plaintiff's legal conclusions are not accepted as true. *Iqbal*, 556 U.S. at 678.

Pleadings of pro se plaintiffs "must be held to less stringent standards than formal pleadings drafted by lawyers." *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) (holding that pro se complaints should continue to be liberally construed after *Iqbal*).

## II. ALLEGATIONS IN THE FIRST AMENDED COMPLAINT

The FAC alleges that the following occurred while Plaintiff was incarcerated at Kern Valley State Prison.

### A. May 16, 2019, Incident

On May 16, 2019, inmate Washington was in an argument with another inmate. Correction officers Yeary, Villegas, Licea, Carrillo, Ramirez, Urbano, Chavez, and Cruz came onto Plaintiff's unit on Section B of Facility C. One of the officers had Washington sit down at a table so that inmates could be searched and released to the yard. Carrillo opened the doors on the bottom tier of the cell block first. Plaintiff, whose cell is located at the end of the bottom tier, came out of his cell once the door was opened.

> Plaintiff with clothing in his hands put clothing on the table across from [where] Washington (porter) was seated, to put his mobility vest on. Washington got up and came around the table and took a wild clenched fist punch at Plaintiff's face and Plaintiff ducked out of the way. No order was given to inmate Washington to stop fighting. Immediately after Washington missed the attempt to punch Plaintiff's face, Washington quickly grabbed Plaintiff's cane and swung it at Plaintiff's face. Plaintiff moved out of the way and when Washington trie[d] to reverse his swing Plaintiff grabbed him and took him to the floor and tried to restrain him (Washington). That is when c/o Yeary, c/o Villegas (unit officer) and others assaulted Plaintiff; those others were c/o Licea, c/o J. Carrillo (in control manning the unlock for the yard release), C. Ramirez, J. Urbano . . . . It was Sgt Cruz who came into the unit as c/o Yeary had placed Plaintiff in cuffs and was forcing Plaintiff to his feet by his thumbs after he had been simultaneously pepper sprayed and shot with 40 mm launch twice during and after Plaintiff had released inmate Washington. It was c/o Yeary, c/o Villegas, c/o Licea, c/o Ramirez who used their pepper spray on Plaintiff, with c/o Carrillo shooting two 40 mm launcher bullets at Plaintiff hitting Plaintiff in the upper leg and left thigh, causing irreparable damage.

(ECF No. 21 at 15-16.)

3

### B. Medical Treatment Following May 16, 2019, Incident

Following the May 16, 2019, incident, Plaintiff was taken to the patio by Officer Chavez. Plaintiff was blinded by the pepper spray that had been sprayed only 15 inches from his eyes and caused temporary vision loss for about an hour. On the patio, "Plaintiff was ordered to his knees with a fractured leg and an open gash on the leg and on the left hip to decontaminate for two minutes or less" by putting his head under the faucet.

While still out on the patio, Plaintiff was examined by RN Cudal. "Plaintiff had pepper spray up his nose and while being examined by RN Cudal, Plaintiff was threatened by Chavez that if he did not stop sneezing he would be placed in Ad. Seg." After the exam, "Plaintiff suffered being placed in a holding cell in the program office. An officer had to go to my cell for my inhaler because of my choking and loosing consciousness. After an hour Plaintiff was allowed to sign a [] chrono and was released to where he walked back to his unit and pleaded [with] c/o Carrillo for a shower to decontaminate." (ECF No. 21 at 17.) Plaintiff's wounds needed medical attention and although Plaintiff submitted several 7362s, he received only a 30-day supply of Tylenol and an x-ray for the leg injury from the May 16, 2019, incident.

The injury report for the May 16, 2019, incident was signed by both RN Cudal and RN Blankenship. However, Blankenship did not screen or examine Plaintiff on May 16, 2019. "As the months went by Blankenship examined my leg with Dr. Ulit three times setting up appointments for operations and physical therapy which has not happened all of 7 months now." (ECF No. 21 at 18.)

"Plaintiff's leg wound left a very large knot on it after healing that is hard, and painful and somehow did not show up on the x-rays of the leg. On October 8, 2019, Plaintiff was on appointment to see Screening Nurse Blankenship. I showed her my leg and the knot that does not show on x-ray and her response was 'What's the problem—you're not dead!' We argued about her cancelling my appointments" and treatment regarding an injury to Plaintiff's hand. "When Plaintiff mentioned litigation Blankenship said 'F_ _ k you and get out of my office,' with c/o Johnson saying the same thing." (ECF No. 21 at 18-19.)

////

### C. August 2019 and October 2019 Incidents

The FAC includes new claims for retaliation and inadequate medical care related to incidents alleged to have occurred in August and October 2019. For the reasons discussed below, the Court finds that Plaintiff has not stated a cognizable federal claim in relation to the May 16, 2019, incident and the Court recommends dismissing those claims with prejudice. In light of this recommendation, the Court does not screen or discuss Plaintiff's new federal claims related to August and October 2019 incidents. Instead, the Court recommends that these new claims be dismissed without prejudice so that Plaintiff can file a separate action in which he can pursue the new claims. Accordingly, the Court does not include factual allegations related to the August and October 2019 incidents.

### III. SECTION 1983

The Civil Rights Act under which this action was filed provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. "[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979*)); see also Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 618 (1979); *Hall v. City of Los Angeles*, 697 F.3d 1059, 1068 (9th Cir. 2012); *Crowley v. Nevada*, 678 F.3d 730, 734 (9th Cir. 2012); *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006).

To state a claim under § 1983, a plaintiff must allege that (1) the defendant acted under color of state law, and (2) the defendant deprived him of rights secured by the Constitution or federal law. *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006); *see also Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1158 (9th Cir. 2012) (discussing "under color of state law"). A person deprives another of a constitutional right, "within the meaning of § 1983,

'if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made.'" *Preschooler II v. Clark Cnty. Sch. Bd. of Trs.*, 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)). "The requisite causal connection may be established when an official sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms." *Preschooler II*, 479 F.3d at 1183 (quoting *Johnson*, 588 F.2d at 743). This standard of causation "closely resembles the standard 'foreseeability' formulation of proximate cause." *Arnold v. Int'l Bus. Mach. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981); *see also Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008).

Additionally, a plaintiff must demonstrate that each named defendant personally participated in the deprivation of his rights. *Iqbal*, 556 U.S. at 676-77. In other words, there must be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by Plaintiff. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691, 695 (1978).

"Local governing bodies… can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where… the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690 (footnote omitted).

"Plaintiffs who seek to impose liability on local governments under § 1983 must prove that action pursuant to official municipal policy caused their injury. Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law. These are action[s] for which the municipality is actually responsible." *Connick v. Thompson*, 563 U.S. 51, 60–61 (2011) (internal citations and quotations omitted) (alteration in original).

Supervisory personnel are generally not liable under § 1983 for the actions of their employees under a theory of respondeat superior and, therefore, when a named defendant holds a supervisory position, the causal link between him and the claimed constitutional violation

must be specifically alleged. *Iqbal*, 556 U.S. at 676-77; *Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979); *Mosher v. Saalfeld*, 589 F.2d 438, 441 (9th Cir. 1978). To state a claim for relief under § 1983 based on a theory of supervisory liability, a plaintiff must allege some facts that would support a claim that the supervisory defendants either personally participated in the alleged deprivation of constitutional rights; knew of the violations and failed to act to prevent them; or promulgated or "implement[ed] a policy so deficient that the policy itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation." *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989) (citations and internal quotation marks omitted); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). For instance, a supervisor may be liable for his "own culpable action or inaction in the training, supervision, or control of his subordinates," "his acquiescence in the constitutional deprivations of which the complaint is made," or "conduct that showed a reckless or callous indifference to the rights of others." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) (internal citations, quotation marks, and alterations omitted).

## IV. ANALYSIS OF PLAINTIFF'S CLAIMS

### A. <u>Eighth Amendment Excessive Force Claim</u>

"In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not . . . use excessive physical force against prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976, 128 L. Ed. 2d 811 (1994) (citing *Hudson v. McMillian*, 503 U.S. 1 (1992)). "[W]henever prison officials stand accused of using excessive physical force in violation of the [Eighth Amendment], the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7 (citing *Whitley v. Albers*, 475 U.S. 312 (1986)).

When determining whether the force was excessive, the court looks to the "extent of the injury suffered by an inmate . . . , the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Hudson*, 503

U.S. at 7 (quoting *Whitley*, 475 U.S. at 321). While *de minimis* uses of physical force generally do not implicate the Eighth Amendment, significant injury need not be evident in the context of an excessive force claim, because "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson*, 503 U.S. at 9 (citing *Whitley*, 475 U.S. at 327).

Here, Plaintiff alleges excessive force claims against Defendants Yeary, Villegas, Licea, Carillo, Ramirez, Urbano, Chavez, and Cruz. Plaintiff alleges that these defendants are correctional officers at KVSP who were on duty and present during the May 16, 2019, incident, and that they are the officers who used excessive force against Plaintiff by using excessive pepper spray on Plaintiff (Yeary, Villegas, Licea, Ramirez), by shooting two 40 mm "launcher bullets" at Plaintiff and hitting Plaintiff on the upper leg and left thigh (Carrillo), and forcing Plaintiff to his feet by his thumbs (Cruz).

A comparison of the facts alleged in the FAC and the facts alleged in the original Complaint regarding the May 16, 2019, incident reveals that Plaintiff excluded key factual allegations from the FAC that were part of the original Complaint and has included factual allegations in the FAC that are inconsistent with or contradict allegations in the original Complaint. In light of these contradictions, the Court relies on facts alleged in the original Complaint and recommends striking those inconsistent or contradictory portions of the FAC. *See Harbridge v. Schwarzenegger*, No. CV 07-4486-GW SH, 2011 WL 6960830, at *8 (C.D. Cal. Aug. 31, 2011) (Collecting cases and explaining "[w]here allegations in an amended complaint contradict those in a prior complaint, a district court need not accept the new alleged facts as true, and may, in fact, strike the changed allegations as 'false and sham.'"), *report and recommendation adopted sub nom. by Harbridge v. Sumpter*, No. CV 07-4486-GW SH, 2012 WL 33176 (C.D. Cal. Jan. 5, 2012).

Plaintiff's original Complaint, alleged the following:

> At approximately 9:20 a.m., on May 16, 2019, there was a call over the intercom that it was "five minutes to yard release," and seven to eight correction officers entered Unit B, C-Yard, Building #2, to secure the release of inmates from their cells and out to the yard. Inmate [Washington] (V06127) was a porter in the

8

unit that morning and Plaintiff was in his cell (C2-111 Lower Yard), which was five cells down from Inmate [Washington]. [Washington] had been arguing with another inmate, so a correctional officer, who was located in control, told [Washington] to keep the noise down or he ([Washington]) would be put into his cell. [Washington] responded by claiming that this officer was being racist.

One of the officers who had come into Unit B for yard release told [Washington] to have a seat. The bottom tier cell doors were then opened and Plaintiff, whose cell was the last to open, came out and set his cane on the opposite side of the table from where [Washington] was seated. While Plaintiff was putting on his mobility vest, [Washington] got up, came around the table behind Plaintiff and swung at Plaintiff with his fist, attempting to punch Plaintiff in the face. Plaintiff was able to duck and avoid the punch. [Washington] immediately grabbed Plaintiff's cane from the table and swung it at Plaintiff's face, which Plaintiff again avoided by ducking. [Washington] was in the process of reversing his grip to swing again when Plaintiff grabbed [Washington], disarmed [Washington] by taking away the cane, and took [Washington] to the floor. After Plaintiff took [Washington] to the floor, [Washington] attempted to get up and Plaintiff restrained [Washington] on the floor by getting on top [Washington's] back and holding [Washington] by the waist.

None of the seven to eight officers who had entered Unit B did or said anything until after Plaintiff was restraining [Washington] on the floor. Plaintiff was then shot with a 40 mm "Launcher" in the thigh and the knee, and was pepper sprayed twice in the face from 12" to 15" away from his eyes. Then, several more canisters were "simultaneously being sprayed all over me. I held my breath as I continued to hold [Washington] down for fear of him yet trying to punch and wrestle away. That's when two blows to my tricep caused me to release Inmate [Washington]."

Plaintiff was ordered to put his hands behind his back and lay on his stomach. He was grabbed by his thumbs and his thumbs were twisted so hard that his thumb knuckles were painful and swollen for over a month.

(ECF No. 18 (Screening Order summarizing allegations in the original Complaint).)[1]

Plaintiff's allegations demonstrate that after Washington attempted to hit Plaintiff, Plaintiff took Washington to the floor, got on top of Washington and held Washington around the waist to keep him pinned to the floor; that Plaintiff continued to keep Washington pinned to the floor and refused to let go of Washington despite the force that was being used against him,

---

[1] In the original Complaint, Plaintiff alleged that the inmate who tried to hit him was named "Williams." In the FAC, Plaintiff alleges that the inmate who tried to hit him was named "Washington." Accordingly, the Court has replaced the name "Williams" with the name "Washington."

9

including the use of pepper spray by Villegas, Yeary, Licea, and Ramirez. Instead, Plaintiff states that, in response to the pepper spray, he merely held his breath and continued to hold Washington down, and that he only released Washington after an officer struck two blows to Plaintiff's tricep. Although Plaintiff now alleges that these defendants used pepper spray and launcher bullets on him after he released Washington, these allegations contradict Plaintiff's previous allegations and should accordingly be deemed stricken.

Viewing the allegations from the original Complaint, supplemented only by allegations in the FAC that are consistent with and do not contradict the allegations in the original Complaint, the Court finds that Plaintiff's own facts establish that the pepper spray, "launcher bullets," and other force used against Plaintiff during the May 16, 2019, incident was needed to "maintain or restore discipline" and was not used "maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7. Thus, Plaintiff has failed to state a cognizable excessive force claim against Defendants Yeary, Villegas, Licea, Carrillo, Ramirez, Urbano, Chavez, and Cruz.

### B. Right to Personal Security Claim

Prison officials must take reasonable measures to guarantee the safety of inmates. *See Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984). A prison official can be liable for failing to protect inmates only if: (1) there is an "excessive" and "substantial risk of serious harm," and (2) the official is subjectively aware of that risk but deliberately ignores it. *Farmer v. Brennan*, 511 U.S. 825, 828-29 (1994).

Here, Plaintiff alleges that Washington came around the table and immediately threw a punch at Plaintiff's face, which Plaintiff avoided by ducking; that Washington immediately grabbed Plaintiff's cane from the table and swung it at Plaintiff's face, which Plaintiff again avoided by ducking; and that Washington was in the process of reversing his grip on the cane when Plaintiff charged Washington and took him to the floor. Plaintiff also alleges that Defendants Yeary, Villegas, Licea, Carrillo, Ramirez, Urbano, Chavez, and Cruz were present during the incident and did nothing to stop Washington when Washington attempted to hit Plaintiff.

Plaintiff has failed to allege facts demonstrating that Defendants noticed what was

happening, that they subjectively knew that there was an excessive and substantial risk of serious harm to Plaintiff, and that they had time to intervene to stop Washington. Accordingly, Plaintiff has failed to state a cognizable failure to protect claim against Defendants Yeary, Villegas, Licea, Carrillo, Ramirez, Urbano, Chavez, and Cruz.

### C. Inadequate Medical Care Claims Related to May 16, 2019, Incident

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Assuming the medical need is "serious," a plaintiff must show that the defendant acted with deliberate indifference to that need. *Id.* "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). It entails something more than medical malpractice or even gross negligence. *Id.* Deliberate indifference exists when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Critically, "a difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014). Instead, to establish deliberate indifference in the context of a difference of opinion between a physician and the prisoner or between medical providers, the prisoner "'must show that the course of treatment the doctors chose was medically unacceptable under the circumstances' and that the defendants 'chose this course in conscious disregard of an excessive risk to plaintiffs health.'" *Id.* at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)). In other words, where there has been some arguably appropriate treatment, deliberate indifference cannot be established merely by showing disagreement with the physician but only by showing that the defendant chose a course of treatment knowing that it was inappropriate. Put differently, a court cannot substitute its judgment for that of a medical

professional, but it can examine a medical professional's good faith in selecting a course of treatment.

Plaintiff brings a claim of deliberate indifference to serious medical needs for injuries suffered during the May 16, 2019, incident against four defendants: Defendant Chavez, Defendant Cudal, Defendant Blankenship, and Defendant Rohrdanz.

### 1. *Defendant Chavez*

Plaintiff alleges that Defendant Chavez is the correctional officer who took care of the decontamination process on the patio following the May 16, 2019, incident. Plaintiff alleges that Chavez ordered Plaintiff onto his knees and instructed Plaintiff to bend down and put his head under a faucet attached to the building, gave Plaintiff about two minutes to rinse, and then told Plaintiff that was all the water he was going to get, even though Plaintiff complained about the burning pepper spray and asserted that he had the right to a "proper decontamination treatment." Plaintiff also alleges that he was sneezing because he had pepper spray in his nose and that Chavez threatened that if Plaintiff did not stop sneezing, he would be placed in Ad Seg. Plaintiff was then seen and questioned by RN Cudal regarding Plaintiff's injuries. After Cudal completed this screening, Chavez placed Plaintiff into a holding cell, where Plaintiff was held for 30 minutes. Chavez then released Plaintiff to his unit and told Plaintiff to ask the unit officer whether Plaintiff could take a shower.

Plaintiff's allegations are insufficient to demonstrate that Chavez—who is not a medical professional—was being deliberately indifferent to Plaintiff's serious medical needs. To the contrary, although Chavez gave Plaintiff limited time to rinse his head, Plaintiff was then screened by a medical professional in Chavez's presence and before Chavez put Plaintiff into the holding cell and then released Plaintiff back onto his unit. Chavez even suggested that Plaintiff seek to take a shower, presumably so that Plaintiff could remove any remaining pepper spray.

Chavez's alleged conduct does not demonstrate that Chavez knew of and disregarded an excessive risk to Plaintiff's health or safety. The allegations are accordingly insufficient to state a cognizable claim of deliberate indifference to serious medical needs against Defendant

Chavez. *See Farmer*, 511 U.S. at 837.

### 2. *Defendant Cudal*

Plaintiff alleges he was seen by RN Cudal on May 16, 2019, after he had been allowed to rinse his eyes and while he was still on the patio standing naked. Cudal asked Plaintiff if he had any injuries and Plaintiff showed Cudal his upper left leg where the 40 mm launcher had bashed into and caused about a one inch long and deep wound on Plaintiff's leg and "smashed" Plaintiff's bone. Cudal saw that the flesh wound was "laid open and bleeding dark red blood." Cudal completed the injury report while they were on the patio and the injury report was submitted to RN Blankenship. Cudal did not provide any treatment for Plaintiff's injuries. Plaintiff alleges that the injury report stated that Cudal had screened Plaintiff on May 16, 2019, but that this statement was false because neither Cudal nor Blankenship provided Plaintiff with any treatment for the wound on his leg and his "smashed bone." Finally, Plaintiff alleges that because of the negligence of Cudal, Plaintiff has a "bone protruding out about an inch high on my leg."

Plaintiff's allegations are insufficient to state a claim for deliberate indifference against Defendant Cudal. First, although Plaintiff alleges that Cudal falsely stated in the injury report that she had screened Plaintiff, Plaintiff also alleges that Cudal saw Plaintiff, asked him about his injuries, and that Plaintiff showed Cudal his injuries, including the wound on his leg. These allegations demonstrate that Cudal did screen Plaintiff. That Cudal did not immediately provide any treatment for Plaintiff's injuries does not make her report stating that she screened Plaintiff false.

Second, a one inch wound on Plaintiff's leg, although it is alleged to have also been deep, does not, without more, rise to the level of a serious medical need, and Cudal's failure to provide treatment for that wound does not, by itself, demonstrate deliberate indifference. *See Estelle*, 429 U.S. at 104 (inmate must show that medical need is "serious," and that the defendant acted with deliberate indifference to that need).

Third, although Plaintiff alleges he had a "smashed" or "crushed" bone, he has not

alleged that there was a break in the bone[2] or other injury to his bone that was obviously serious; or that Cudal actually knew about a serious injury to Plaintiff's bone and that, despite this knowledge, she consciously chose to disregard the injury. *See id.* Plaintiff's disagreement with Cudal's decision not to provide treatment for the "smashed" bone does not, without more, demonstrate deliberate indifference to Plaintiff's serious medical needs. *Snow*, 681 F.3d at 987 ("[A] difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference."); *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (setting forth standard for deliberate indifference to serious medical needs, and explaining that a prisoner must show harm "caused by" the indifference to establish deliberate indifference); *Toguchi*, 391 F.3d at 1057-58 (prisoner's difference of opinion with prison medical authorities is insufficient to state a deliberate indifference claim).

Finally, although Plaintiff alleges that Cudal acted negligently in relation to the bump that developed on Plaintiff's leg, negligence is insufficient to state a claim for deliberate indifference under the Eighth Amendment. *Id.* at 106 (only deliberate indifference violates the Eighth Amendment; negligence in diagnosing or treatment is insufficient); *Whitey v. Albers*, 475 U.S. 312, 319 (1986) (deliberate indifference requires "more than ordinary lack of due care for the prisoner's interests or safety"); *Toguchi*, 391 F.3d at 1057-58 (negligence is insufficient to state a deliberate indifference claim).

For these reasons, the FAC fails to state a cognizable claim against Defendant Cudal for deliberate indifference to serious medical needs.

### 3. Defendant Blankenship

Plaintiff alleges that fifteen days after the May 16, 2019, incident, after Plaintiff had submitted four requests for medical treatment for the crushed bone and wound on Plaintiff's leg, and a golf-ball sized knot that developed on Plaintiff's leg, he was finally seen by

---

[2] Although Plaintiff alleges in the FAC that his leg was "fractured," the Court finds this contradictory to Plaintiff's original complaint regarding the injury on Plaintiff's leg as being "smashed" or "crushed" and resulting in a bump. The Court accordingly rejects Plaintiff's attempt in the FAC to characterize Plaintiff's injury as a fracture.

Blankenship. Plaintiff requested treatment and an x-ray. Blankenship screened Plaintiff and told him that his leg was healing up properly, and that "everything looks good and is healing up just fine." Plaintiff alleges that this was not true because Plaintiff had a golf-ball sized knot on his leg that was causing him a great deal of pain and suffering, and that the wound on his leg was still only partially healed. Plaintiff alleges that he requested and was given an x-ray of his leg and that Dr. Rohrdanz, Plaintiff's primary care physician, reviewed the x-ray results and stated, "Your test results are essentially within normal limits or are unchanged, and no provider follow-up is required." Plaintiff alleges that he submitted requests for an outside doctor's opinion and therapy but that these requests have not been answered by Blankenship. Plaintiff also admits that the bump on his leg did not show up on the x-ray.

Plaintiff's allegations are insufficient to state a claim for deliberate indifference to serious medical needs against Defendant Blankenship. First, as discussed above in relation to Cudal, the one inch wound on Plaintiff's leg does not rise to the level of a serious medical need, and Blankenship's failure to provide treatment to Plaintiff for that wound does not by itself demonstrate deliberate indifference. *See Estelle*, 429 U.S. at 104 (inmate must show that a medical need is "serious" and that the defendant acted with deliberate indifference to that need); *Jett*, 439 F.3d at 1096 (setting forth standard for deliberate indifference to serious medical needs and explaining that a prisoner must show harm "caused by" the indifference to establish deliberate indifference).

Second, Blankenship examined Plaintiff and determined that his wounds looked good and were "healing up just fine"; Plaintiff received an x-ray of his leg and his primary care physician said that no further treatment was needed; and Blankenship again examined Plaintiff and told Plaintiff everything was fine. Thus, Plaintiff was seen and examined twice by Blankenship, and received an x-ray of his leg with a determination by Dr. Rohrdanz that no further treatment was needed. Although Plaintiff disagrees with the treatment—or determination that no further treatment was needed—and alleges he had a bump protruding from his leg that required treatment, Plaintiff's allegations merely demonstrate that Plaintiff disagreed with Blankenship's decision that no treatment was needed. This difference of opinion

as to the need for further treatment does not amount to deliberate indifference. *Snow*, 681 F.3d at 987 ("[A] difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference."); *Toguchi*, 391 F.3d at 1057-58 (prisoner's difference of opinion with prison medical authorities is insufficient to state a deliberate indifference claim).

Third, Plaintiff's allegations demonstrate that his leg was x-rayed, and that the bump on his leg did not show up on the x-ray. Plaintiff does not allege facts demonstrating that any delay in obtaining an x-ray resulted in further harm to Plaintiff. Indeed, the bump on Plaintiff's leg did not even show up on the x-ray. Further, Dr. Rohrdanz reviewed the x-ray and determined that no further treatment was needed. Thus, Plaintiff has not alleged facts sufficient to state a claim for deliberate indifference based on what appears to be a few-week delay in receiving the x-ray. *See Hallett v. Morgan*, 296 F.3d 732, 746 (9th Cir. 2002) (prisoner alleging deliberate indifference based on delay in treatment must show that delay led to further injury).

Fourth, although Plaintiff alleges that his requests for an outside doctor's opinion and treatment have been ignored, Plaintiff has no independent constitutional right to outside medical care additional and supplemental to the care provided by prison medical staff. *Roberts v. Spalding*, 783 F.2d 867, 870 (9th Cir. 1986) ("A prison inmate has no independent constitutional right to outside medical care additional and supplemental to the medical care provided by the prison staff within the institution."). Thus, Blankenship's alleged failure to respond to Plaintiff's request for care by a doctor outside of the prison does not demonstrate deliberate indifference.

Finally, Plaintiff's allegations that Blankenship acted negligently in relation to the bump that developed on Plaintiff's leg are insufficient to state a claim under the Eighth Amendment. *Estelle* at 106 (only deliberate indifference violates the Eighth Amendment; negligence in diagnosing or treatment is insufficient); *Whitey*, 475 U.S. at 319 (deliberate indifference requires "more than ordinary lack of due care for the prisoner's interests or safety").

For these reasons, Plaintiff's factual allegations are insufficient to state a claim against Defendant Blankenship for deliberate indifference to serious medical needs.

*4. Defendant Rohrdanz*

Plaintiff alleges that he received an x-ray and that Defendant Rohrdanz, Plaintiff's primary care physician, reviewed the x-ray and stated that the test results "are essentially within normal limits or are unchanged, and no provider follow-up is required." These allegations contradict Plaintiff's allegation that his requests for x-rays were ignored and he had not received x-rays.

Plaintiff also alleges that he has not been seen by Dr. Rohrdanz and that Dr. Rohrdanz has not responded to Plaintiff's urgent medical requests despite Plaintiff's submission of six or seven 7362 sick call request forms. However, as discussed above, Plaintiff has been seen by RN Blankenship at least twice, and Dr. Rohrdanz examined Plaintiff's x-rays and determined that no additional treatment was needed. The failure of Dr. Rohrdanz to personally examine Plaintiff does not demonstrate deliberate indifference, nor does Plaintiff's disagreement with Dr. Rohrdanz's determination that no follow-up was needed. *See Snow*, 681 F.3d at 987 ("[A] difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference."); *Toguchi*, 391 F.3d at 1057-58 (prisoner's difference of opinion with prison medical authorities is insufficient to state a deliberate indifference claim).

For these reasons, Plaintiff's allegations are insufficient to state a claim against Defendant Rohrdanz for deliberate indifference to serious medical needs.

**D. Claim against Defendant Washington**

Defendant Washington is the inmate who allegedly attempted to hit Plaintiff on May 16, 2019. Based on the allegations in the Complaint, Washington was not acting under color of state law and did not deprive Plaintiff of any rights secured by the Constitution or federal law. Thus, Plaintiff has not stated and cannot state a cognizable claim against Washington under § 1983. *See Long*, 442 F.3d at 1185 (to state a claim under § 1983, a plaintiff must allege that the defendant acted under color of state law, and the defendant deprived him of rights secured by the Constitution or federal law).

////

### E. New Federal Claims related to Alleged August and October 2019 Incidents

As discussed above, the FAC includes new federal claims for retaliation and inadequate medical care related to alleged incidents in August and October 2019. However, Plaintiff has not stated a cognizable federal claim related to the May 16, 2019, incident, on which his original Complaint was based. The Court thus does not screen or discuss Plaintiff's new federal claims brought in the FAC related to the August and October 2019 incidents. Instead, the Court recommends that these new claims be dismissed without prejudice. If Plaintiff wishes to pursue these new federal claims, he may do so by filing a separate action.

### F. State Law Claims

The complaint also alleges various state law claims. However, Plaintiff has failed to state a cognizable federal claim related to the May 16, 2019, incident on which his original Complaint was based. Further, the Court is recommending dismissing without prejudice Plaintiff's new federal claims related to August and October 2019 incidents. The Court therefore recommends declining to exercise supplemental jurisdiction over Plaintiff's putative state law claims.[3] *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (when federal claims are eliminated before trial, district courts should usually decline to exercise supplemental jurisdiction).

### G. Leave to Amend Should be Denied

If the Court finds that a complaint should be dismissed for failure to state a claim, the Court has discretion to dismiss with or without leave to amend. *See Lopez v. Smith*, 203 F.3d 1122, 1126-30 (9th Cir. 2000) (en banc). Leave to amend should be granted if it appears possible that the defects in the complaint could be corrected, especially if a plaintiff is *pro se*. *See id.* at 1130-31; *see also Cato v. United States*, 70 F.3d 1103, 1106 (9th Cir. 1995) ("A pro se litigant must be given leave to amend his or her complaint, and some notice of its deficiencies, unless it is absolutely clear that the deficiencies of the complaint could not be cured by amendment.") (citation omitted). However, if, after careful consideration, it is clear

---

[3] The court takes no position on whether Plaintiff would be able to successfully pursue his claim in state court.

18

that a complaint cannot be cured by amendment, the Court may dismiss without leave to amend. *Cato*, 70 F.3d at 1005-06.

After careful consideration, the Court finds that Plaintiff's allegations against Defendants related to the May 16, 2019, incident cannot establish a plausible federal claim as a matter of law and that amendment would accordingly be futile. Plaintiff's underlying factual allegations are clear. The issue is that the factual circumstances raised by Plaintiff in relation to the May 16, 2019, incident do not give rise to a constitutional claim.[4]

## V. RECOMMENDATIONS

IT IS HEREBY RECOMMENDED:

1. That Plaintiff's federal claims related to the May 16, 2019, incident be dismissed with prejudice;
2. That Plaintiff's new federal claims related to alleged incidents in August and October 2019, be dismissed without prejudice;
3. That Plaintiff's state law claims be dismissed without prejudice; and
4. That the Clerk of the Court be directed to close this case.

These findings and recommendations will be submitted to the United States district judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within **thirty (30) days** after being served with these findings and recommendations, Plaintiff may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."

\\\
\\\
\\\
\\\
\\\

---

[4] The Court has not screened and expresses no opinion as to whether Plaintiff's allegations regarding alleged August and October 2019 incidents state a cognizable federal claim, or whether Plaintiff has stated any cognizable state law claim.

19

Plaintiff is advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **February 10, 2020**　　　　　　　/s/ *Erica P. Grosjean*
　　　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE